NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted October 6, 2020[*]
Decided October 21, 2020

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-3131

| | |
|---|---|
| ERIC PHILLIPSON, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, |
| | Eastern Division |
| | |
| *v.* | No. 14-cv-08138 |
| | |
| CHAD F. WOLF, | Andrea R. Wood, |
| *Defendant-Appellee*. | *Judge*. |

## O R D E R

Eric Phillipson, now 53 years old, believes that he was fired from his job as a planner for the Federal Emergency Management Agency (FEMA) based on his age and in retaliation for his complaints about discrimination, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634. The district court entered

---

[*] On September 18, 2020, we granted the parties' joint motion to waive oral argument. This appeal was therefore submitted on the briefs and the record. *See* FED. R. APP. P. 34(f); CIR. R. 34(e).

summary judgment in favor of FEMA, ruling that no evidence supported an inference of age-based discrimination or retaliation. On appeal, Phillipson contends the district court improperly credited FEMA's version of events over his own. But none of the evidence on which he relies creates a material factual dispute, so we affirm.

**I**

As a preliminary matter, the district court ruled that Phillipson failed to properly dispute FEMA's statement of material facts under Local Rule 56.1 and therefore deemed several of those facts admitted. Phillipson does not dispute this ruling on appeal. Because the district court may reasonably enforce compliance with such rules, we rely on those admitted facts, though in the light most favorable to Phillipson. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

**A**

Phillipson, an Army veteran, began working as a senior planner at FEMA in 2010 when he was 43 years old. He reported to Gus Wulfkuhle, an operational planning branch chief, and Paul Preusse, the director of response. His first year of employment appeared to go well. He testified he was a keynote speaker at a conference, successfully completed several high-profile assignments, and received superior work evaluations.

Late in 2011, however, he exchanged tense emails with Denise Dukes, the chief of FEMA's specialized planning section, whom he accused of wrongdoing (he said she fabricated an issue regarding invoices for contractor payments) and believed should be prosecuted. Dukes complained that she viewed Phillipson's emails as abusive and said she would report him to the Equal Employment Opportunity office. In response, Wulfkuhle warned Phillipson not to communicate with other employees with threats and accusations.

A year later, in December 2012, Phillipson's behavior was again the subject of complaint by colleagues. Wulfkuhle and Preusse received a memorandum from the chief of staff at FEMA's New York office about a scene Phillipson had created while traveling there in the aftermath of Hurricane Sandy. When Phillipson was brought into the field office to account for a skirmish with a security guard in FEMA's parking garage, he was argumentative and raised his hand and voice at security and supervisory staff. The chief of staff characterized the incident as a security threat and recommended disciplinary action. Wulfkuhle, after investigating and reviewing witness statements, officially reprimanded Phillipson for inappropriate behavior in that

incident, as well as in the email exchange with Dukes, and another instance when Phillipson raised his voice at a colleague upon learning that one of his travel vouchers was not reimbursed promptly.

Then, in the first part of 2013, Phillipson ran afoul of several office policies: He requested sick leave without explanation (and later without notifying his supervisors), did not submit proper documentation for travel reimbursement, had to redo several assignments, and misused his travel charge card (his card statement reflected a charge for a meal while he was not on official travel, and he missed nine payments on the card's balance).

In April, Wulfkuhle took further disciplinary action against Phillipson. He issued a notice of proposed suspension based on Phillipson's behavior in New York and his misuse of his travel charge card. Later, he began denying Phillipson's sick-leave requests when Phillipson failed to check in with a supervisor before leaving the office. Preusse reviewed Wulfkuhle's proposal and decided against suspension, but he warned Phillipson that future issues with his behavior would result in disciplinary action "up to and including termination."

That same month, Phillipson filed an administrative grievance, making general allegations of discrimination and asserting he had been reprimanded and threatened with suspension in retaliation for pointing out waste and mismanagement within the agency. His union representatives stepped in to try to negotiate resolutions to his complaints, and an EEO counselor later informed Wulfkuhle that Phillipson had brought allegations of discrimination against him.

In July, Phillipson acted out a verbal rage in a bathroom at work. An investigation into potential workplace violence was carried out by Richard Amburgey, FEMA's regional security officer, who interviewed six employees about Phillipson's behavior. Four employees reported that they felt uncomfortable around Phillipson because of his frequent ranting; one said that "when I am talking to [Phillipson], he is very disgruntled and I feel like he is going to stab me in the neck."

In mid-August, after Amburgey's investigation, Phillipson filed a formal complaint of age discrimination. Wulfkuhle, he asserted, had wrongly denied his requests for sick leave, pursued unwarranted disciplinary measures against him, and made false and defamatory statements about him.

A month later, Wulfkuhle evaluated Phillipson's performance as "less than expected" based on deficiencies in the areas of completing tasks, customer service, and coordination. Negotiations with Phillipson's union representatives ensued, and Wulfkuhle upgraded his evaluation of Phillipson's performance to be "on track."

But over the next year Phillipson's relationship with Wulfkuhle deteriorated. In February 2014, after further negotiations with union representatives, Wulfkuhle revised his reprimand letter for the parking-garage incident by excising references to the two other cited incidents. When he summoned Phillipson to his office to pick up the updated letter, Phillipson refused and accused him of staging a "farce." And later that month, the two men clashed over a white paper that Wulfkuhle asked Phillipson to draft with regard to specific areas in which FEMA needed national policy guidance. Phillipson instead wrote a paper criticizing Wulfkuhle and Preusse as incompetent. When Wulfkuhle asked him to revise the report, Phillipson refused and accused him of malfeasance and mismanagement. Phillipson's recalcitrance prompted Wulfkuhle in March to again propose suspending him. Phillipson lashed out that Wulfkuhle was "despicable" and a "coward." Later, he accused Wulfkuhle of perjury and malfeasance in his responses to questions about work assignments. In yet another affray, Phillipson brushed off Wulfkuhle's revisions to a nuclear-response plan, annotating each edit with a footnote that imputed error to Wulfkuhle and not "the writer or preparer of the plan."

After several months of insubordinate behavior, compounded by reports that he was harassing colleagues, in September 2014 Phillipson was placed on administrative leave with pay. Upon collecting his belongings from his office, he taunted Wulfkuhle, "Well, Gus, how much do you think your ass is worth?" As a condition of his paid leave, he was required to check in with Wulfkuhle every day by email. Though Phillipson asserts he sent daily emails, Wulfkuhle marked Phillipson "AWOL" for several days and later suspended him. Believing that Phillipson's emails may have been blocked by a firewall, he asked Phillipson to send new, "clean" emails each day instead of responding to old message chains. Phillipson then began checking in by copying Wulfkuhle on long email chains, in which he accused Wulfkuhle of abusing his authority, harassing him, committing perjury, and engaging in criminal activity. In late 2015, at Preusse's suggestion, Phillipson was fired for inappropriate conduct and failure to follow instructions and agency policy.

**B**

Phillipson sued FEMA for discriminating against him based on his age and retaliating against him for his complaints about the discrimination. He asserted that

Wulfkuhle harassed him, denied his legitimate requests for sick leave, held him to higher standards than younger employees, and pursued unwarranted disciplinary actions against him.

FEMA eventually moved for summary judgment, and the district court—in a thorough and careful opinion—granted its motion. Regarding Phillipson's age-discrimination claim, the court ruled that he failed to establish a prima facie case under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), because a jury could not find that he was meeting FEMA's legitimate expectations (given his negative performance reviews, his lack of professionalism when interacting with coworkers, his lack of compliance with FEMA policy, and his unwillingness to follow his supervisor's instructions), or that any similarly situated employees were treated materially better than him. As for his retaliation claim, the court concluded no reasonable juror could determine that he was suspended or fired in retaliation for the grievances and complaints he had filed.

## II

On appeal Phillipson contends he presented sufficient evidence of both discrimination and retaliation to defeat summary judgment. We review those rulings de novo. *Tyburski v. City of Chicago,* 964 F.3d 590, 597 (7th Cir. 2020).

### A.   Discrimination

Phillipson first challenges the district court's conclusion that he presented insufficient evidence that he was being discriminated against on the basis of his age. To survive summary judgment, he had to put forth evidence suggesting that, "but for his age, the adverse action would not have occurred." *Tyburski,* 964 F.3d at 598; *see also Ortiz v. Werner Enters.,* 834 F.3d 760, 764 (7th Cir. 2016). Phillipson sought to present this evidence under the burden-shifting framework of *McDonnell Douglas. Tyburski,* 964 F.3d at 598. Under this approach, he had to provide evidence that: (1) he belonged to a protected class, (2) he was meeting FEMA's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *See McDonnell Douglas Corp.,* 411 U.S. at 802; *Tyburski,* 964 F.3d at 598. Phillipson focuses on the second prong, regarding his performance. He asserts the district court ignored his "superior" evaluations and his completion of high-profile assignments before Wulfkuhle began harassing him. Wulfkuhle, he says, fabricated concerns about his performance and then used them as a pretext to instigate a series of adverse actions.

The district court correctly rejected Phillipson's contention that he can create a factual dispute through his own statements about his "superior" work evaluations. While a non-moving party may dispute facts through deposition testimony that is self-serving, *see Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018), Phillipson's statements about his superior performance are belied by ample evidence in the record documenting his insubordination (including his hostility towards Wulfkuhle and refusal to follow instructions), inappropriate conduct (such as the scene at the New York parking garage and his belligerent outbursts in the office), and failure to follow office policy (especially with regard to travel charge card use and sick leave). Phillipson tries to rationalize his conduct, but the extent of all this record evidence would not permit a reasonable juror to conclude that he was meeting FEMA's legitimate expectations. And without any material evidence to the contrary, he cannot establish a prima facie case of discrimination—thereby dooming his claim.

For the sake of completeness, we briefly address Phillipson's challenge to the district court's conclusion that he could not establish an additional requirement under the *McDonnell Douglas* framework—that similarly situated younger employees received better treatment. Phillipson names three former colleagues—James Cullen, J.P. Marsch, and Brian Morrill—who, he asserts, were allowed to take sick leave without permission and generally received more flexibility in their schedules than he did.

Nothing in the record supports this general contention. As the district court noted, Phillipson submitted only his own deposition testimony to support his assertions that other employees were treated better than he was. In that testimony he admitted that he did not know—and had no way of knowing—whether any of the employees he named were indeed allowed to change their work schedules. Even more, nothing suggests that these employees are proper comparators because no evidence suggests that they engaged in similar patterns of misconduct and skated by without reprimand. *See Weber v. Univs. Research Ass'n*, 621 F.3d 589, 594 (7th Cir. 2010).

## B. Retaliation

Phillipson also challenges the district court's conclusion that he presented insufficient evidence of retaliation. He contends that court ignored circumstantial evidence of his supervisor's retaliatory intent. Maintaining that the disciplinary actions against him were suspiciously timed, he identifies the charge he filed with the EEO in August 2013 as the event that triggered the negative performance review he received in September of that year and Wulfkuhle's later campaign to take adverse actions against him. He likens himself to the plaintiffs in *Culver v. Gorman & Co.*, 416 F.3d 540, 546–47

(7th Cir. 2005), and *Lang v. Illinois Dep't of Children & Family Servs.*, 361 F.3d 416, 419–21 (7th Cir. 2004), two cases in which we vacated judgment for the employers after concluding that sudden negative performance reviews of an employee who had complained about discrimination could constitute circumstantial evidence of retaliation.

The district court correctly concluded that no reasonable juror could conclude that Phillipson was suspended or fired because of his grievances and complaints. To prevail, he needed to present evidence permitting a factfinder to conclude that his engagement in a protected activity was the "but for" cause of an adverse employment action. *See Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 626 (7th Cir. 2019). Phillipson, however, introduced nothing to dispute the evidence demonstrating that he was fired for a legitimate reason. Further, his negative performance evaluation in September 2013 was hardly "sudden" or suspiciously timed; by this time, he already had received warnings over his inappropriate conduct—in 2011, when he exchanged emails with Denise Dukes, and early in 2013, when he was officially reprimanded for his outburst in the parking garage of the New York field office. True, Wulfkuhle admitted in a deposition that he was "upset" by Phillipson's EEO complaints, but a supervisor's being "upset" is not—without more—evidence upon which a reasonable factfinder could infer retaliatory animus. *See Mannie v. Potter*, 394 F.3d 977, 983–84 (7th Cir. 2005).

AFFIRMED